# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| VITAL PHARMACEUTICALS, INC., d/b/a VPX SPORTS/REDLINE/BANG ENERGY, a Florida corporation,<br><br>*Plaintiff*,<br><br>v.<br><br>CHRISTOPHER ALFIERI, an individual, ADAM PERRY, an individual, ANDREW LAROCCA, an individual, AMY MAROS, an individual and ELEGANCE BRANDS INC., a Delaware corporation,<br><br>*Defendants*. | CASE NO: 0:20-cv-61307-AHS |

**DECLARATION OF CHRISTOPHER ALFIERI**

I, Christopher Alfieri, make the following declaration based on my personal knowledge.

1. I am over the age of eighteen. I submit this declaration in support of Defendants' Response in Opposition to Plaintiff Vital Pharmaceuticals, Inc., d/b/a VPX Sports/Redline/Bang Energy's ("VPX") Motion for Preliminary Injunction (DE 5).

2. I worked for over twenty years for Red Bull and third-party distributors of Red Bull. Ultimately, I spent two years in a national distribution leadership role at Red Bull.

3. In 2019, I began looking for another job. Eugene Bukovi of VPX reached out to me and asked me about joining VPX. I agreed contingent upon being able to negotiate my employment deal. Specifically, I told Mr. Bukovi that I would not sign a non-compete agreement. Mr. Bukovi stated that I would not be required to sign a non-compete agreement.

4. I joined VPX on July 30, 2019 as Vice President of Sales and Distribution.

5. The VPX Human Resources team instructed me to complete a new hire packet so that I could make the appropriate health insurance selections, complete W-4 & I-9 forms, and complete the direct deposit form. There was no mention of a non-compete included in the paperwork. Soon thereafter, the paperwork was emailed to my personal email address to be completed via DocuSign. Most of the fields on much of the paperwork was prepopulated with my information. After making all the proper health insurance and tax selections, the form skipped to sections that needed to be signed. With one click, a signature was placed electronically on the document. I immediately began working. VPX provided no onboarding. VPX provided no training.

6. Within two weeks, I was instructed to do things that I found at-odds with the best interest of the Company. I was repeatedly threatened with termination for baseless reasons.

7. Problems also arose given the work environment created by VPX's Principal, Jack Owoc. For example, Mr. Owoc routinely fired individuals—including those on my team without consulting me—for unwarranted reasons.

8. I was terminated on March 27, 2020. I received a call from the head of Human Resources who told me that I was terminated immediately without cause. I was told that I would not receive any severance of monetary compensation for the abrupt termination. I sent my VPX-supplied equipment back to VPX the next day.

9. Co-packers in the beverage industry, including those utilized by VPX, manufacture drinks for multiple beverages, including direct competitors.

10. I did not have access to any information that could be deemed confidential or trade secret information during my VPX tenure. Forms, contracts, and industry contacts were based on knowledge I brought to VPX through my previous experience and standard practices within

the industry. I have no information regarding new Bang flavors or products or timing of their potential release. I have no information that could materially, let alone irreparably, harm VPX in any way.

11. I never had access to the preblend formulas for any of VPX's beverages.

12. I joined Elegance in early May 2020. My role with Elegance is to sell spirits, bitters, products, cocktails, liqueurs and CBD beverages. I immediately updated my Linkedin to reflect my new position. Individuals employed by VPX routinely looked at my Linkedin following this change.

13. Bang and Elegance's portfolio of products are in completely different categories. Elegance is selling spirits, bitters products, cocktails, liqueurs, and CBD beverages. Elegance's goal is to create an entirely new subcategory of the energy drink market that focus on hemp-based products. This would not impede on VPX's market share.

14. Many retailers now categorize Bang as a "performance energy" drink. As a result, many retailers (for example, Kroger) do not place Bang alongside energy drinks (Red Bull, Monster, etc.) but with sports drinks such as Gatorade.

15. Further, my limited knowledge of VPX's strategy is not something that I would encourage Elegance to emulate in any way. For example, VPX instructed me and others to draft "breach" letters to distributors as a means of terminating its relationships with them. In my estimation, this was an incorrect move and would open the door to VPX being sued. VPX issued the letters against my recommendation and was subsequently sued.

16. VPX recently announced an exclusive distribution deal for its Bang products with Pepsi Co. As a result, VPX terminated all of its non-Pepsi Co. distributors. I knew many of the

distributors that used to work with VPX before I started there as I worked with them during my Red Bull employment.

17. None of the distributors that have engaged with Elegance had exclusive relationships with VPX when they engaged with Elegance, if ever. These distributors carry direct competitors of Bang—including brands such as Celsius and C4.

18. When I joined Elegance, Gorilla Hemp Energy Drink ("Gorilla Hemp") was virtually completed. The can design and blend had already been completed, and approximately 6,000 cases had already been produced. I had no involvement in either the can design or the blend.

19. My work with the Gorilla Hemp product involved reviewing publicly available state statutes and regulations pertaining to the sale of CBD-based products.

20. The Stoked CBD drink is produced by a company controlled by Mr. Owoc known as Stoked of Delaware, LLC d/b/a Stoked. It does not utilize the same suppliers of CBD, or even the same type of CBD as Gorilla Hemp.

21. The origin and type of CBD contained in CBD drinks can always be identified by a Quick Response matrix barcode located on the product. This includes the Stoked CBD drink.

22. Gorilla Hemp is not yet on the market.

23. I anticipate that approximately 85% of Gorilla Hemp sales will come from traditional convenience stores.

I declare under penalty of perjury that the above is true and correct.

Executed on August 7, 2020.

_____
Christopher Alfieri

4